ERIE R. CO. v. UNITED STATES (two cases).

(Circuit Court of Appeals, Sixth Circuit.   March 6, 1917.)

Nos. 2869, 2870.

1. RAILROADS ⚖══229—REGULATION—SAFETY APPLIANCE ACT—PROVISO.
      Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531, as amended by Act April 1, 1896, c. 87, 29 Stat. 85, and Act March 2, 1903, c. 976, 32 Stat. 943 (Comp. St. 1913, §§ 8605–8615), makes it unlawful for a common carrier to haul any car not equipped with couplers coupling automatically by impact.  Act April 14, 1910, c. 160, 36 Stat. 298, contained a proviso that where any car had been properly equipped as provided in the safety appliance act, and the equipment had become defective while the car was being used, it might be hauled from the place where the defect was first discovered to the closest available place where it could be repaired, but that such movement should be at the sole risk of the carrier, and should not relieve it from liability for the death or injury of any railroad employé caused by reason of the hauling of the car with defective equipment, with a subproviso that nothing in the proviso should be construed to permit the hauling of defective cars by means of chains, instead of drawbars, in revenue trains or in association with other cars that are commercially used.  Held, that the subproviso, when given its correct grammatical construction, and also when construed according to its obvious meaning, and to effectuate the purpose of the amendment of 1910, which was to permit the hauling of bad order cars to repair shops, prohibited only the hauling of cars with chains in commercial or revenue trains, but did not prohibit absolutely the hauling of cars with chains and the hauling of bad order cars in commercial or revenue trains.
      [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743.]

2. STATUTES ⚖══200—CONSTRUCTION—PUNCTUATION.
      The presence of the comma in the subproviso between the provisions for hauling cars with chains and the other provisions is not determinative as to the construction, since the presence or absence of a comma in a statute, according to the whim of the printer or proof reader, is so nearly fortuitous that it is wholly unsafe as an aid to statutory interpretation.
      [Ed. Note.—For other cases, see Statutes, Cent. Dig. § 278.]

3. RAILROADS ⚖══229—REGULATION—SAFETY APPLIANCE ACT—CONSTRUCTION.
      Since the remedy of employés for injuries received because of the cars not being coupled as required, which was the remedial feature of the Safety Appliance Act, entitling it to liberal construction, is not affected by the provision in Act April 14, 1910, § 4, the amendment need not be construed strictly against the railroad, but should be liberally construed to effectuate its purpose to permit the necessary moving of cars which had become defective while in operation.
      [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743.]

4. RAILROADS ⚖══229—REGULATION—SAFETY APPLIANCE ACT—CONSTRUCTION.
      Even if the provision in the amendment of Act April 14, 1910, § 4, without the subproviso, did not authorize the hauling of defective cars in commercial or revenue trains, but only in special trains, the subproviso, by

expressly prohibiting the hauling of cars by chains in revenue or commercial trains, excludes other cars from the effect of the proviso.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743.]

5. RAILROADS ☞229—REGULATION—SAFETY APPLIANCE ACT—CONSTRUCTION —"ANY CAR."

The fact that the proviso applies to "any car" does not exclude from its operation a train or association of cars, since the original prohibition likewise is directed only against hauling any car, and that construction of the expression would exclude all trains from the whole Safety Appliance Act.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743.

For other definitions, see Words and Phrases, First and Second Series, Any Car.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Two actions by the United States against the Erie Railroad Company to recover the statutory penalties for violation of the Safety Appliance Act. Judgment for the plaintiff, and defendant brings error. Reversed and remanded for new trial.

L. A. Manchester, of Youngstown, Ohio, for plaintiff in error.

E. S. Wertz, U. S. Atty., of Cleveland, Ohio, and Mr. Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

DENISON, Circuit Judge. These two cases present the same question, with regard to separate, but similar, incidents. In actions brought to recover the statutory penalties for violation of the Safety Appliance Act (27 Stat. 531) as amended (29 Stat. 85, and 32 Stat. 943), a verdict was directed against defendant on five counts, involving five cars; and to review judgments imposing the penalty of $100 for each violation, the railroad brings these writs of error.

It appeared without dispute that defendant's N K yard at Youngstown is an interchange yard between various railroads; that government inspectors at this yard, as these cars came into the yard, found them defective because they would not couple by impact, and marked them as "bad order"; that, after each car was so marked, the railroad hauled it, for the purpose of being repaired, from its N K yard four miles to its Brier Hill yard, in a train in which there were other cars engaged in interstate traffic, and in which there were mixed empties and loaded cars in commercial use, and none of which trains was strictly a "hospital train"; and that no one of the cars contained live stock or perishable fruit. By conceded facts, or by the railroad's offer to prove, it further appeared, or might be inferred, that the cars had serious injuries requiring major repairs; that they had once been properly equipped as provided by law, but had become defective while being used; that they were first discovered to be defective while in the N K yard; that there was no shop or repair track at that yard; that it was necessary to haul the cars to the Brier Hill yard, which did have

shops and facilities; that hauling to the Brier Hill yard was necessary
to make the required repairs, and that they could not be made except
at the Brier Hill yard; that the Brier Hill yard was the nearest avail-
able point where the cars could be repaired; and that no one of the
cars was so hauled by means of chains instead of drawbars. The ver-
dict was directed, because the District Judge was of the opinion that,
conceding all these facts to be as claimed by the railroad, there was a
violation of the law.[1]

The essential parts of the statute which must determine defendant's
liability are as follows:

Section 2 of the act of March 2, 1893, as amended (29 Stat. 85): "That on
and after the first day of January, 1898, it shall be unlawful for any
* * * common carrier to haul or permit to be hauled or used on its line
any car used in moving interstate traffic not equipped with couplers coupling
automatically by impact, and which can be uncoupled without the necessity
of men going between the ends of the cars."

Act of March 2, 1903 (32 Stat. 943): "* * * The provisions and re-
quirements hereof and of said acts relating to train brakes, automatic couplers,
grab irons, and the height of drawbars shall be held to apply to all trains,
locomotives, tenders, cars, and similar vehicles used on any railroad engaged
in interstate commerce."

From section 4 of the act of April 14, 1910 (36 Stat. 298): "Provided, that
where any car shall have been properly equipped, as provided in this act and
the other acts mentioned herein, and such equipment shall have become de-
fective or insecure while such car was being used by such carrier upon its
line of railroad, such car may be hauled from the place where such equipment
was first discovered to be defective or insecure to the nearest available point
where such car can be repaired, without liability for the penalties imposed by
section 4 of this act or section 6 of the act of March 2, 1893, as amended by
the act of April 1, 1896, if such movement is necessary to make such repairs
and such repairs cannot be made except at such repair point; and such move-
ment or hauling of such car shall be at the sole risk of the carrier, and
nothing in this section shall be construed to relieve such carrier from liabili-
ty in any remedial action for the death or injury of any railroad employé
caused to such employé by reason of or in connection with the movement or
hauling of such car with equipment which is defective or insecure or which
is not maintained in accordance with the requirements of this act and the
other acts herein referred to; and nothing in this proviso shall be construed
to permit the hauling of defective cars by means of chains instead of draw-
bars, in revenue trains or in association with other cars that are commercially
used, unless such defective cars contain live stock or 'perishable' freight."

From section 5 of the act of April 14, 1910: "That except that, within the
limits specified in the preceding section of this act, the movement of a car
with defective or insecure equipment may be made without incurring the
penalty provided by the statutes, but shall in all other respects be unlawful,
nothing in this act shall be held or construed to relieve any common carrier."

Prior to 1910, the prohibition in the Safety Appliance Act against
hauling cars which would not couple automatically by impact seemed
to be absolute and unconditional. It was obvious that cars would be-
come defective in this particular, or be discovered to be so defective,
either while they were in transit between stations or while they were
upon a side track or in a yard where it was impossible to make repairs.
If this occurred in transit where there was no side track, the defective
car could not be set out from the train, unless it happened to be the last

---

[1] The record did not require the conclusion that the cars had become de-
fective before they came to be used by defendant on its line.

car, and, if it was, it could not be left there without blocking the track, and it could not be hauled even to the nearest side track without violating the letter of the original law; so, if the defect was discovered while the car was in transit, but was of a character that could be repaired only at some other place, hauling the car to the nearest place where it could be repaired violated this same letter of the law. These practical difficulties led some courts to construe the statute as intended to permit a hauling which was necessary for the purpose of making the necessary repairs; but this court, following what seemed to be the rules of construction applied by the Supreme Court to other parts of this same statute, held that its letter must be observed, and that even such a necessary movement was forbidden, if made in connection with other cars commercially used. Southern Ry. Co. v. Snyder, 187 Fed. 492, 497, 109 C. C. A. 344.

It was not expressly decided in the Snyder Case that a bad-order car could be hauled to a repair point, if it was hauled alone and not in connection with cars commercially used. That question was not presented by the Snyder Case. So far as what this court there said may imply that such a movement would be permitted, it is not now necessary to consider whether such implication was correct. The Supreme Court in Southern Ry. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, held that it is immaterial whether the bad-order car was or not used in connection with interstate cars, and that the prohibition, which was absolute in form, was directed broadly against any railroad engaged in interstate commerce. Whether or not the distinction between hauling a bad-order car alone and hauling it in connection with cars commercially used was based on the supposed force of the words "used in connection therewith," in section 1 of the act of 1903 (Chicago & N. W. Ry. v. United States, 168 Fed. 236, 93 C. C. A. 450, 21 L. R. A. [N. S.] 690), and whether or not the logical basis of the distinction disappeared when the Supreme Court held that this clause "used in connection therewith" was redundant and ineffective, it is enough to say that the decision in Southern Ry. Co. v. United States, taken in connection with the view of the statute adopted in St. Louis, etc., Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061, and when both were read in the light of the unqualified prohibition of the statute, created such a situation that the Senate committee, in reporting this amendment, said:

"There is, therefore, great doubt as to the right of a railroad company to move even a defective car to a point of repair."

It should be noted, also, that if there was any special force in the word "use," as found in the act of 1893 and the amendment of 1903, so that the hauling of a car, from the place where it was found defective even to the nearest side track where it was set out, could be excused on the ground that such car was not "in use," that possibility has disappeared, through the form fixed by the amendment of 1910 for the first part of section 4, which penalizes "permitting to be used or hauled on its line any car," etc., thus reaching even any "hauling" (if any there be) which might not be "use."

[1] In this situation, Congress passed the amendment of 1910, containing the proviso in section 4. This is a clear legislative recognition that the strictness of the statute ought to be relaxed in this particular; and accordingly we find that, after this amendment was incorporated, section 2 still forbade, generally, the hauling of such defective car, but that section 4 specified, by way of exception to the general prohibition, that it might nevertheless be hauled "to the nearest available point where such car can be repaired." So far, the application of the law to the facts in this case is clear, and, by the provisions of section 4 up to this point, the hauling, if of the character claimed by defendant, was lawful; whatever uncertainty there is arises from the further proviso, which may be called a subproviso, to section 4, and which says that:

"Nothing in this proviso shall be construed to permit the hauling of defective cars by means of chains instead of drawbars, in revenue trains or in association with other cars that are commercially used," etc.

This exception or proviso is capable of more than one construction. It may refer only to cars where the coupling devices are so defective that the cars must be hauled by chains, instead of drawbars. This we call the first construction. If this is to be adopted, it excepts such chained-up cars from the general hauling permission given in the body of the proviso and, as to them, restricts that permission to some method which does ont involve hauling them in association with other cars commercially used, and thus, by inference, permits the hauling of a chained-up car to the nearest available repair point by an engine devoted only to that car, or in "hospital trains," or perhaps in some other way. By what we call the second construction, the subproviso refers to three different classes of cars, and forbids the hauling of defective cars: (a) By means of chains instead of drawbars; (b) in revenue trains; or (c) in association with other cars commercially used. If this is right, defective cars cannot be hauled at all by means of chains instead of drawbars, nor can they be taken even to the nearest repair point, unless by themselves and not in association with commercial cars. This second construction is the one contended for by the government and adopted by the court below; the first is urged by the plaintiff in error.

[2] The case must be decided, practically, as one of first impression; the question has not been considered in any reported decision. We are convinced that the first construction is the right one; and several considerations persuade us to this end. As a matter of the precise use of words and punctuation, the contention of the government is unsatisfactory. It requires the insertion of the word "or" before "in revenue trains," and the word is not there; the comma cannot take its place. The presence or absence of a comma, according to the whim of the printer or proof reader, is so nearly fortuitous that it is a wholly unsafe aid to statutory interpretation. Fed. Stat. Ann. (2d Ed.) title Statutes and Statutory Construction, § 50. Further, if it was intended to present three successive classes, each modifying "defective cars," and since the word "or" (which would indicate the equal standing of the three classes) is omitted between the first two, it would be natural

to expect, and nicety of language would require, that each class be introduced by repeating the same preposition; but here, we have "by," "in," and "in." As a matter of strictest construction we are inclined to think that the adverbial phrases "in revenue trains" and "in association with" modify, not merely "hauling," but rather "hauling by means of chains." If three correlative and independent things are prohibited, transposition in the order of their mention ought to make no difference in the meaning; but this test is disastrous to the government's contention. If we thus make what, by this theory, ought to be an innocent and ineffective transposition, the proviso would prohibit the "hauling of defective cars in revenue trains or in association with other commercial cars by means of chains instead of drawbars"; and this shows the importance of the omitted "or," and brings us directly back to the first construction. In other words, "by means of chains" would then clearly apply to and modify "hauling revenue trains" and "hauling in association," etc. Thus we see that the first construction makes perfect English of the subproviso, while the second construction requires some distortion and grammatical violence.

However, to determine the meaning of a statute on such grounds is usually to be overnice; we elaborate this matter, not as entirely satisfactory support for our view, but to demonstrate that the other meaning is not required by the most literal adherence to the words and the grammar of the law. Since both constructions are open, it is merely to beg the question to say that the first is the natural and obvious one; yet this impression cannot be resisted, and is, in some measure, confirmed by observing that Mr. Justice Van Devanter said, in United States v. Erie R. R., 237 U. S. 402, 409, 35 Sup. Ct. 621, 624 (59 L. Ed. 1019), while reciting the effect of the subproviso according to what he evidently thought was the obvious meaning, that the subproviso "declares that nothing therein shall be construed to permit the hauling of defective cars 'by means of chains instead of drawbars' in association with other cars in commercial use." He evidently interprets the subproviso according to the construction which we have thought the right one; and this is some indication that it is the meaning naturally to be attributed to the language used.

[3] The construction which we adopt is, in our judgment, required by a broad view of the purpose and intent of the proviso. The general prohibition of the act had been most strictly construed. The amendment permitting hauling to a repair point tended to enlarge, and not to restrict, the rights of the carrier. The "remedy" given by the amendment was to permit hauling to a repair point, and this amendment should be construed "to advance the remedy." Since it was often necessary that a defective car should be hauled in a revenue train from the point where the defect was discovered to some place where the car could at least be set out of the train, and since this necessity undoubtedly was one of the moving causes for the amendment of 1910, we see little room for doubt that the amendment was intended to permit such hauling in revenue trains as far as might be necessary to escape that strictness in the law which the amendment implied was unreasonable. In the form in which the amendment was first reported

to Congress, it did not contain the subproviso. We do not need expert testimony to know that where the coupler was defective only in that it would not couple and uncouple automatically, but was otherwise in good order, there was practically no danger resulting from this defect to the remainder of the train; the danger was to the employés—a subject kept unchanged by the amendment. It is equally clear that when the drawbars themselves were inoperative, and would not serve to pull the car, so that it was necessary to couple with chains, distinct danger resulted to the remaining cars. The amount of slack which often would exist would tend to result in injury to the air hose and to the cars and their contents, to say nothing about other adjacent cars in the train, or about the constant danger of breaking the train in two through breaking the chains. So it was clear that, while it would be comparatively unobjectionable to permit defective cars to be hauled a short distance in a revenue train, if the drawbars were operative, and if the liability to employés were preserved, it would be a very different thing and much more dangerous to permit cars to be hauled coupled by chains to a revenue train. There was, therefore, excellent reason for distinguishing and for refusing to permit the general permission given by the main body of the proviso to extend to the cars coupled by chains. From this point of view, the subproviso and its interpretation according to the first construction are most natural and tend to carry out the probable if not the certain intent of Congress.

In getting the right viewpoint for the amendments of 1910, it is further to be remembered that, under the former acts, the conflict between the canons that a penal statute should be strictly construed and a (so-called) remedial statute liberally was resolved in favor of the latter view largely—and, it seems, mainly—in order to give effect to the supposed dominant intent of the law that the employés' right to recover for personal injuries should not be impaired by any relaxation of the restrictions; and this right the 1910 amendments expressly and fully preserve. However we interpret "nearest available point," and even if "hospital trains" of chained-up cars may be moved to a repair point, and even if defective cars not chained may be hauled in a revenue train to the nearest available repair point, this underlying purpose to give the employé an unimpaired right of action is not touched; he may recover, regardless of the fact that the movement to the repair point was perfectly lawful. The rule disappears when its reason does; hence the rule of construing strictly against the railroad the provisions of the act, as that rule was established before 1910, has its force distinctly lessened, at least, as applied to this amendment.

Another consideration leading to the same result is that many cars are injured so that the drawbars will not work and so that chains must be used; these injuries occur everywhere and anywhere on the road; the necessity for moving, to suitable repair places, cars with this kind of injury, is often more apparent than with the cars that have less injuries; yet, upon the second construction, that favored by the government, cars so injured cannot be moved at all, and as to them the whole broad purpose of the proviso of section 4 utterly fails; they must be left where they are, beyond the reach of repair, and perhaps blocking

the traffic; they cannot even be chained together to make a "hospital train" and be hauled away for repairs. It would be even unlawful to chain up a single one to an engine and pull it away. The construction which leads to such results cannot be right; and yet the government's contention rests upon the proposition that the hauling of defective cars is absolutely prohibited (a) if in revenue trains; (b) if in association with other commercial cars; and (c) if the drawbars are so injured that chains must be used.

[4] Even if it be thought that the body of the proviso of section 4, omitting this subproviso, ought not to be interpreted so as to permit defective cars to be hauled even a few miles in a revenue train, that would not be controlling, when we give the subproviso what we must think its true meaning. When it prohibits hauling certain kinds of defective cars in revenue trains, and does not extend the prohibition to other kinds, and where it is obviously attempting to make very precise and accurate regulations, it must follow from the familiar canons of construction that those other kinds are not included within the prohibitions; and this brings us to the same result, viz., that cars not so defective as to require chains in the place of drawbars may be hauled in revenue trains to the nearest available place of repairs.

We are cited to some comment in the committee's report to the Senate, as tending to show that it was not intended to allow damaged cars to move in connection with those commercially used. As to this comment, it may be said, first, that it is ambiguous, and very likely was intended to refer only to hauling generally, and not to refer to hauling only to the nearest repair point; and, second, that the comment was made before this subproviso was a part of the act. We get no help from this report. It may as well be argued that the later insertion of the subproviso was expressly intended to cure a defect indicated by this comment.

[5] It is said that, because the permission of the proviso of section 4 extends only to "any car," it should not be thought of as reaching a train or an association of cars, or, in other words, that general permission to haul a car does not extend to hauling it in a train or in any way except alone. This construction is fatal to the whole purpose of the act, because the original prohibition of section 2 and the penalties of section 4 are not directed against hauling trains having defective cars, but are against hauling "any car." Consequently, if a car alone and a car in a train are essentially different things, and if the language "any car" reaches the former and not the latter, sections 2 and 4, the main sections of the act, do not reach trains including defective cars, but only such a car as a separate unit; and, of course, this construction is not right.

These views require that the judgment shall be reversed, and the case remanded for a new trial.