UNITED STATES v. MISSOURI PAC. RY. CO.

MISSOURI PAC. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. June 5, 1917.)

Nos. 4793, 4794.

1. MASTER AND SERVANT ⬤⟹13—HOURS OF SERVICE—COMPUTATION.
   Under Hours of Service Act March 4, 1907, c. 2939, § 2, 34 Stat. 1416 (Comp. St. 1916, § 8678), providing that no telegraph operator shall be on duty for longer than 9 hours in any 24-hour period at continuously operated offices, where an operator was on duty regularly from 7 a. m. to 3 p. m., the 24-hour period commenced at 7 a. m., and where on one occasion he was excused from 1:30 p. m. to 3 p. m., when he returned to duty and remained on duty until 5:10 p. m., the fact that he was on duty for more than 9 hours in the 24-hour period commencing at 3 p. m., was not a violation of the statute.

2. MASTER AND SERVANT ⬤⟹13—HOURS OF SERVICE—EMERGENCIES.
   Where a railroad dispatcher intended to have carloads of live stock picked up by a certain train, but through inadvertence and oversight failed to give the necessary orders, and to avoid holding the live stock until the next day, and causing loss and damage to the shipper and the company, ordered such cars picked up by a train which, owing to unexpected and unforeseen delays, did not leave the station where they were picked up until the operator had been on duty more than 13 hours, there was no emergency justifying the excess service under Hours of Service Act, § 2,

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

permitting operators to remain on duty for more than the hours thereby prescribed in case of emergency, as the oversight or inadvertence of the dispatcher could not constitute an emergency.

3. MASTER AND SERVANT ⟨⟩13—HOURS OF SERVICE—EMERGENCIES.

Where a railroad dispatcher was misinformed as to the time of arrival of a train load of silk to be delivered to his road by a connecting road, and, wishing to handle such train with expedition and promptness, kept an operator on duty for more than 9 hours to hold another train and receive orders in reference thereto, and thus permit the prompt moving of the silk train, there was no emergency justifying the operator's excess service.

4. MASTER AND SERVANT ⟨⟩13—HOURS OF SERVICE—EMERGENCIES.

Where a railroad telegraph operator was kept on duty more than 9 hours because part of a freight train was derailed on account of a drawbar pulling out of one of the cars and falling on the track, thereby delaying a passenger train in reaching his station, and it was necessary to hold him on duty until such train arrived for the purpose of handling the mail and caring for passengers upon its arrival, the excess service was caused by an emergency and was justified.

5. MASTER AND SERVANT ⟨⟩13—HOURS OF SERVICE—"EMERGENCY."

That a train was delayed in leaving a station owing to broken packing rings in one of the cylinders of the engine, making it necessary to send for a relief engine, was not such an emergency as justified keeping the operator at such station on duty more than 9 hours, since while the word "emergency" as used in the law does not mean an extraordinary emergency as used in some statutes, it means more than ordinary mistakes and negligences which happen in the practical operation of railroads.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Emergency.]

Stone, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit for statutory penalties by the United States against the Missouri Pacific Railway Company. Judgment sustaining demurrers to certain counts and overruling demurrers to other counts (235 Fed. 944), and each party brings error. Affirmed.

John A. Gordon, Asst. U. S. Atty., of Denver, Colo., and Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C. (Harry B. Tedrow, U. S. Atty., of Denver, Colo., on the brief), for the United States.

J. W. Preston, of Pueblo, Colo. (Edw. J. White, of St. Louis, Mo., B. P. Waggener, of Atchison, Kan., and T. H. Devine and Todd C. Storer, both of Pueblo, Colo., on the brief), for Missouri Pac. Ry. Co.

Before CARLAND and STONE, Circuit Judges, and RINER, District Judge.

CARLAND, Circuit Judge. The United States brought this action against the Railway Company to recover penalties for violations of the Hours of Service Act (34 Stat. 1415). The complaint in 12 counts charged that the Railway Company permitted certain operators at Arlington, Boone, Sheridan Lake, and Haswell, Colo., to be and remain on duty for longer hours than allowed by law in any 24-hour period.

The Railway Company answered each count of the complaint except the fourth and ninth by pleading facts which it claimed consti-

tuted an emergency within the meaning of the law. As to counts 3, 4, 5, 7, 8, 9, 10, 11, and 12, the Railway Company pleaded also in its answer that the United States in those counts had adopted an erroneous method in computing the 24-hour period during which each employé performed his service. The trial court sustained the demurrer of the United States as to all the defenses of emergency except as to count 5. It overruled the demurrer as to the defenses, which pleaded a miscalculation of the 24-hour period, so that the judgment that was finally rendered was for the United States as to counts 1, 2, and 6, and for the Railway Company as to counts 3, 4, 5, 7, 8, 9, 10, 11, and 12. The Railway Company has sued out a writ of error to review the ruling of the court as to the first, second, and sixth causes of action; and the United States has sued out a writ of error to review the ruling of the court as to counts 3, 4, 5, 7, 8, 9, 10, 11, and 12.

The questions for consideration, therefore, are as follows: (a) Did the court err in sustaining the demurrer of the United States to the Railway Company's plea of emergency to the first, second, and sixth counts of the complaint? (b) Did the court err in overruling the demurrer of the United States to the plea of emergency contained in the answer of the Railway Company to the fifth count of the complaint? (c) Did the court err in overruling the demurrer to the defense pleaded in counts 3, 4, 5, 7, 8, 9, 10, 11, and 12, to the effect that the 24-hour period within which a violation of the statute is alleged should be counted from the time the employé first goes on duty for his day's work. No error is assigned by the Railway Company as to the ruling of the court on the defense of emergency contained in the answer to counts 3, 7, 8, 10, 11, and 12, as judgment was rendered in its favor on these counts by reason of the other defense pleaded.

[1] To illustrate the defense interposed by the Railway Company as to the method of computing the 24-hour period, count 3 and the answer thereto, so far as material on this point, may be quoted as follows: Count 3:

"Defendant, during the twenty-four hour period beginning at the hour of 3:00 o'clock p. m., on September 6, 1914, at its office and station at Sheridan Lake, in the state of Colorado, and within the jurisdiction of this court, required and permitted its certain telegraph operator and employé, to wit, W. F. Coughlin, to be and remain on duty for a longer period than nine hours in said twenty-four hour period, to wit, from said hour of 3:00 o'clock p. m. on said date to the hour of 5:10 o'clock p. m. on said date, and from the hour of 7:00 o'clock a. m. on September 7, 1914, to the hour of 3:00 o'clock p. m. on said date."

Answer:

"Further answering the third count or cause of action in said complaint, defendant says that the station Sheridan Lake, mentioned therein, is what is known as a two-man station, and that the hours of service of employés thereat at the time in question were as follows: Agent's hours from 7:00 a. m. to 4:00 p. m.; operator's hours from 7:45 p. m. to 4:45 a. m. Office closed from 4:00 p. m. to 7:45 p. m. and from 4:45 a. m. to 7:00 a. m.

"That W. F. Coughlin, the employé mentioned in said count, was the agent at said station, and went on duty each day at the hour of seven o'clock a. m., and did so on September 6, 1914, and was on duty until the hour of 1:30 o'clock p. m. on said day, when he was definitely excused and entirely relieved from duty until the hour of 3:00 o'clock p. m. on said day, when he

returned to work and remained on duty until the hour of 5:10 o'clock p. m. on said day, after which time he was not on duty again until 7:00 o'clock a. m. on September 7, 1914, when he went on duty in regular course and remained on duty until 4:00 o'clock p. m. on said last-mentioned day, and defendant says that the twenty-four hour period referred to in the act relied on by plaintiff, so far as said agent was concerned, began on September 6, 1914, at the hour of 7:00 o'clock a. m., and not at the hour of 3:00 o'clock p. m. on said day, and that said agent was not on duty more than nine hours during the twenty-four hour period beginning at 7:00 o'clock a. m. on September 6, 1914."

The proviso of section 2 of the Hours of Service Act reads as follows:

"Provided, that no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime, except in case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week."

In the case of the United States v. A. T. & S. F. Ry. Co., 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361, the United States contended that when 9 hours have passed from the moment of beginning work the statute allows no more labor within the 24 hours from the same time, even though the 9 hours have not all been spent in work. The Supreme Court refused to sustain this contention, and decided that a man employed for 6 hours, and then, after an interval, for 3, in the same 24, is not employed for a longer period than 9 hours. It, therefore, was permissible for the Railway Company to divide the hours of service provided those hours of service did not exceed 9 hours in any 24-hour period. As against the demurrer the facts stated in the defense to the third count above set forth are of course admitted. It is therefore admitted that W. F. Coughlin, the employé mentioned in the third count, "went on duty each day at the hour of 7 o'clock a. m., and did so on September 6, 1914, and was on duty until the hour of 1:30 o'clock p. m. on said day, when he was definitely excused and entirely relieved from duty until the hour of 3 o'clock p. m. on said day, when he returned to work and remained on duty until the hour of 5:10 o'clock p. m. on said day, after which time he was not on duty again until 7 o'clock a. m. on September 7, 1914, when he went on duty in regular course and remained on duty until 4 o'clock p. m. on said last-mentioned day."

These facts standing admitted, the Railway Company claims that the 24-hour period, so far as this employé was concerned, began on September 6, 1914, at the hour of 7 o'clock a. m., and not at the hour of 3 o'clock p. m., and that said employé was therefore not on duty more than 9 hours during the 24-hour period beginning at 7 o'clock a. m. on September 6, 1914.

Referring now to the charge against the Railway Company as to count 3, we find it alleged that during the 24-hour period, beginning at the hour of 3 o'clock p. m. on September 6, 1914, at the office of the Railway Company at Sheridan Lake, Colo., said Railway Company

permitted W. F. Coughlin, a telegraph operator and employé, to be and remain on duty for a longer period than 9 hours in said 24-hour period, to wit, from said hour of 3 o'clock p. m. on said date to the hour of 5:10 o'clock p. m. on said date, and from the hour of 7 a. m. on September 7, 1914, to the hour of 3 o'clock p. m. on said date. It will thus be seen that it is the claim of the United States that by virtue of the language, "any twenty-four hour period," contained in the law, it may select any 24-hour period that it chooses for the purpose of showing a violation of the law, regardless of the regular time that the employé may go upon duty. In other words, if the Railway Company shall divide 9 hours of service as it is permitted to do, then each time that an employé shall go upon duty pursuant to said lawful division of time is a time from which the 24-hour period may be reckoned.

The position of the United States does not seem to us to be fair to the Railway Company, and it must be conceded that nothing but fairness is desired in the enforcement of the law. The Railway Company is the party which must obey the law. It ought in all fairness to know before the employé is permitted to work just what is being done with reference to hours of service, so that the law may not be violated. It, therefore, by agreement with its employé, fixes the time that the hours of service shall commence and when they shall end. This being done, an inspector in the employ of the United States appears, and, looking over the record of the hours of service, arbitrarily and contrary to the agreement between the Railway Company and the employé, establishes, after the service has been rendered, a different time for the commencement of the 24-hour period, and, by combining certain isolated hours of service performed on different days, seeks to show a violation of the law. We are of the opinion that the law or justice will not permit this to be done.

It is claimed that any construction of the law which will permit the Railway Company to do that which is alleged to have been done in the answer to count 3 would nullify the statute. To show that this is so, it is contended that a 9-hour operator might be required to work for 17 hours without rest. For instance, taking the employé described in count 3 for illustration, it is claimed that he could be worked from 7 a. m. to 8 a. m. on September 6th, and then be excused from duty until 11 p. m. of the same day, and then be required to work through until 7 o'clock the next morning, when he again would be obliged to begin his regular day's work and work through until 4 p. m. that day. In view of the fact that no instance of this kind is shown to have ever occurred, and the improbability that it will ever occur, we may say, in the language of the Supreme Court in the case above cited, "This hardly is a practical suggestion." If any such abuse of the law shall happen, Congress undoubtedly will regulate the matter by proper legislation.

The employé mentioned in the third count had an unbroken rest between the time when he finally quit work on September 6th and the time when he again resumed his duties on September 7th of 13 hours and 50 minutes, so that it appears that he was not overworked or deprived of a proper period of rest. In using the expression "any

twenty-four hour period," Congress did not intend to describe what should constitute in any particular case a 24-hour period. The time when an employé should go to work and when he should be allowed to quit, provided the law was not violated, was left to the agreement between the employé and the employer. It would seem natural that an employer might on occasions, for the convenience of its employés, or to suit the exigencies of traffic, permit or require an operator to divide his usual hours of service. While not conclusive as to the meaning of the law, the declarations of the report of a committee of Congress having in charge a bill are often referred to as highly persuasive for the purpose of showing how the framers of the law understood it.

In the Congressional Record for March 3, 1907, vol. 41, p. 4543, it appears that while Senator Patterson was speaking on this same statute he asked Senator Flint, who was acting as spokesman for the Conference Committee having the bill in charge, the following questions: "Is the twenty-four hour period to be fixed arbitrarily by the company? Is the twenty-four hour period a calendar day? Is the twenty-four hour period to commence with each individual workman as he enters upon the duties of his twenty-four hours of labor?" Senator Flint answered the questions as follows: "The last statement of the Senator is the correct statement." We are of the opinion that the trial judge did not err in his ruling upon this question.

[2] There remains to be considered the question as to whether the facts pleaded in answer to the first, second, fifth, and sixth counts of the complaint constitute emergencies within the meaning of the law. The facts alleged in the answer to the first count of the complaint are substantially as follows: Arlington, Colo., may be called, with reference to the Hours of Service Act, a day station. The hours of service of the operator, and who was also the agent, were from 8 o'clock a. m. to 8 o'clock p. m., with an hour off for dinner from 11 o'clock a. m. to 12 o'clock noon. The employé worked on the day alleged in the complaint during his regular hours, and also was permitted to remain on duty from the hour of 8 o'clock p. m. until the hour of 11 o'clock p. m.

The Railway Company, to justify this excess of service of more than 13 hours during the 24-hour period, alleges that there had been delivered to the Railway Company at Arlington for transportation over its line of railway and connecting lines to Denver, Colo., three carloads of live stock, which live stock had been loaded on the cars of the Railway Company early on the morning of the day mentioned in the first count, and which the dispatcher intended to have picked up and transported in a train passing through Arlington about 10 o'clock a. m. on said day, but said dispatcher, through inadvertence and oversight, failed to give orders to said train to pick up said cars of live stock, and in order to avoid holding said live stock at Arlington until the following day, and thus cause loss and damage to the shipper and to the Railway Company, said dispatcher ordered the next following train to pick up said cars of live stock and transport the same; that said cattle were unloaded from said cars awaiting the arrival of said next following train, which in ordinary course would have arrived and picked up said live stock and would have left Ar-

lington therewith prior to 10 o'clock p. m. on said day, but owing to unexpected and unforeseen delays it did not leave Arlington until 11:10 o'clock p. m. on said day, and that it was necessary to hold said operator on duty at Arlington until the departure of said train in order to assist in loading said live stock into the cars, and to receive and transmit orders to enable said train to leave Arlington and reach Sugar City prior to the time when the employés in charge of said train would have been on duty 16 consecutive hours, and that Sugar City was the first station where said train crew could have been relieved from duty, there being no facilities for so doing at Arlington nor at any station between Arlington and Sugar City, and that the failure on the part of the Railway Company to handle said live stock as it did, following the oversight to deliver the dispatch as aforesaid, would have resulted in heavy damages to said live stock and large financial loss to the Railway Company in consequence. The foundation of the alleged emergency is the fact that the dispatcher inadvertently and through oversight failed to give orders to the train to pick up the cars of live stock. We are clearly of the opinion that the facts pleaded do not constitute an emergency within the meaning of the law. If oversight or inadvertence on the part of an employé should be held to constitute an emergency, the law would fail of its purpose.

[3] The facts pleaded to the second count of the complaint as constituting an emergency are as follows:

"Further answering the second count or cause of action of said complaint, defendant says that the station of Boone mentioned therein was what is known as a two-man station, the agent's hours being from 6 o'clock a. m. to 3 o'clock p. m., and the operator's hours from 3 o'clock p. m. to 12 o'clock midnight, and the office under ordinary circumstances being closed from midnight until 6 o'clock a. m.; that on September 2, 1914, the telegraph operator and employé mentioned in said count was on duty from 3 o'clock p. m. until midnight, and was also on duty from 1:30 o'clock a. m. on September 3, 1914, to 3:30 o'clock a. m. on said date, but defendant says that an emergency existed justifying said operator being on duty for a period of 11 hours in the 24-hour period beginning with 3 o'clock p. m. on September 2, 1914, in that defendant's dispatcher in charge of dispatching trains on the division of defendant's railroad from Pueblo, Colo., to Hoisington, Kan., had been misinformed as to the time of arrival of a train load of silk known as a silk special, to be delivered by the Denver & Rio Grande Railroad Company to this defendant at Pueblo for transportation over defendant's line of railroad east, and that said silk special arrived at Pueblo at 2:45 o'clock a. m. on September 3, 1914, instead of two hours later, as it had been reported to defendant's dispatcher that said silk special would arrive and be delivered to this defendant; that the transportation of silk is very profitable to the carriers handling same, and in order to secure said business it is necessary to handle said silk specials with great expedition and promptness and to lose no time in the transportation thereof; that the danger of theft in handling such shipments is very great, making it inadvisable to permit same to remain at terminals or elsewhere longer than is absolutely necessary to make up trains, and that, to avoid a delay of at least two hours to said silk special at Pueblo, it was necessary for said dispatcher to call said operator on duty at 1:30 o'clock a. m. on September 3, 1914, in order to have said operator hold another train at his said station and receive orders in reference thereto, and thus permit the prompt moving of said silk special, and that said operator was held no longer than was absolutely necessary for this purpose."

Manifestly the facts pleaded as stated above do not constitute an emergency. The foundation of the alleged emergency is that the dispatcher was misinformed as to the time of the arrival of a train load of silk.

[4] The facts pleaded as constituting an emergency in the answer to the fifth count of the complaint are as follows:

"Further answering said fifth count or cause of action, defendant says that if the twenty-four hours beginning with the hour of 3:00 o'clock p. m. on September 28, 1914, constituted a twenty-four hour period within the meaning of the act referred to, an emergency existed justifying the employé mentioned in said cause of action being on duty for such time in excess of nine hours as he was on duty during that period, in that seven cars of freight train known as 'Extra East 1280' were derailed at mile post 446, about one mile west of Bay, a station on the line of defendant east of Sheridan Lake, on account of a drawbar pulling out of car C. & N. W. 73958 in said train, and falling on the track, and notwithstanding the diligent efforts of the defendant, the track was not cleared until 4:15 p. m. on said last-mentioned day, as a result of which passenger train No. 1 west-bound to Sheridan Lake and points west thereof was greatly delayed, and could not and did not reach Sheridan Lake until 5:40 o'clock p. m. on said last-mentioned day, though but for said derailment said train No. 1 would have reached Sheridan Lake before the hour of 4 o'clock p. m. of said day, but on account of said derailment, and said train No. 1 being late as aforesaid, it was necessary to hold said employé on duty after the hour of 4:00 o'clock p. m., when he would otherwise have been relieved from duty for the twenty-four hour period beginning at 7:00 o'clock a. m. on September 28, 1914, and to retain said employé on duty until the hour of 5:40 o'clock p. m. on said day, when said train No. 1 arrived at Sheridan Lake, for the purpose of handling United States mail to and from said train and caring for passengers."

We are of the opinion that the facts above stated do constitute an emergency within the meaning of the law.

[5] The facts pleaded in answer to the sixth count, as constituting an emergency of the complaint, are as follows:

"Further answering the sixth count or cause of action in said complaint, defendant says that an emergency existed justifying the employé mentioned in said count being on duty for any time for which he was on duty in excess of nine hours during the twenty-four hour period in question, in that passenger train No. 3 westbound, which was due to and did arrive at Sheridan Lake at 3:15 o'clock a. m. on October 10, 1914, and which was due to depart therefrom at said last-mentioned hour, was delayed at said station owing to broken packing rings in one of the cylinders of engine No. 1247 which was hauling said train, which rendered said engine incapable of moving out of Sheridan Lake, which necessitated sending a relief engine for said train from Horace, Kansas, which was the nearest station at which said relief engine could be secured, which relief engine did not reach Sheridan Lake until 5:20 o'clock a. m. on said last-mentioned day, and which necessitated retaining said employé on duty after the hour when he would ordinarily have been released, to wit, 4:45 o'clock a. m. on said day, and until the arrival of said relief engine for the purpose of dispatching said train No. 3 out of said station."

In our opinion the facts above pleaded do not constitute an emergency within the meaning of the law. In United States v. Southern Pacific Co., 209 Fed. 562, 126 C. C. A. 384, we decided that with reference to the question of emergency each case must depend upon its own facts. While we may consider the dictionary as to the meaning of the word "emergency," we cannot wholly be guided by that definition in the practical operation of a railroad. The courts must de-

termine each case so that the object which Congress had in view in enacting the statute may be promoted and at the same time give the Railroad Company, in the practical operation of its road, the benefit of the emergency clause. The word "emergency," as used in the law, does not mean an extraordinary emergency as used in some statutes, but it means more than the ordinary mistakes and negligences which happen in the practical operation of railroads. United States v. Southern Pacific Co., 209 Fed. 562, 126 C. C. A. 384; United States v. D. & R. G. Ry. Co., 220 Fed. 293, 136 C. C. A. 275; United States v. B. & O. Ry. Co. (D. C.) 226 Fed. 220; United States v. C. & N. W. Ry. Co. (D. C.) 219 Fed. 342; United States v. K. & C. S. Ry. Co., 202 Fed. 828, 121 C. C. A. 136; United States v. D. & R. G. Ry. Co., 233 Fed. 62, 147 C. C. A. 132; United States v. Missouri Pacific Ry. Co., 213 Fed. 169, 130 C. C. A. 5.

No error appearing in the record, the judgment below is affirmed.

STONE, Circuit Judge (dissenting). I feel constrained to dissent from that portion of the judgment and opinion which holds that the 24-hour period contemplated by the statute does not mean "any 24-hour period." The statute is highly remedial, designed to protect the lives and property of the employés and of the public from casualties occasioned through lack of vigilance of employés caused by overwork.

That construction should be adopted which will best preserve that object. The illustration in the above opinion of the court demonstrates that, under the construction contended for by the Railway Company, an employé whom the statute determined it would be unsafe to keep employed longer than 9 hours out of 24 could be employed 17 hours uninterruptedly without violating the law. In my judgment, the objections to a construction permitting such overwork are not met by the view that it is improbable of occurrence. The particular illustration certainly reveals the possibilities. The very instances involved in this case show the probabilities of conditions differing only in degree, but not in kind, from the illustration.

I agree with the court that one of the considerations to be borne in mind in construing the law is fairness to the railway in the practical operation of its business. The law was not intended to burden the carrier any further than necessary to properly effectuate its main object. On the other hand, the railway must bear such burdens as are intended to be placed upon it by the statute, and the prime one of those is to so arrange the hours of its employés that, outside of the excepted instances named in the statute, none of them shall, under any circumstances, be employed exceeding the stated number of hours, as the statute reads, "in *any* twenty-four hour period."