## UNITED STATES v. ATLANTA TERMINAL CO.

District Court, N. D. Georgia. January 24, 1929.

No. 1047.

M. C. List, Sp. Asst. U. S. Atty., of Washington, D. C., and Hal Lindsay, Asst. U. S. Atty., of Atlanta, Ga.

Howell, Heyman & Bolding, of Atlanta, Ga., for defendant.

SIBLEY, District Judge. This is a suit against the Terminal Company for penalties under the Hours of Service Act (45 USCA § 61 et seq.) on account of overwork of its employees, engaged in handling train orders in a day and night office. It has been submitted on stipulated facts.

█ Though the Terminal Company handles trains only over a very limited trackage in and near its station, they are interstate trains, and the company's employees co-operate with the train dispatchers of the railroad companies and deliver for them train orders to outbound trains. The Terminal Company is engaged in interstate transportation of passengers, within section 1 of the act, and is subject to the act.

█ The main contention comes over the construction of the words, occurring twice in section 2, "in any 24-hour period." To hold them equivalent to any calendar day—that is, from midnight to midnight—would be a certain and easily applied construction; but this has never been contended for, and, because other words would more easily and naturally have expressed that meaning, cannot have been intended. Another meaning is that the period is one beginning at the hour of each day when a particular employee, in the course of his regular duties, usually goes to work, or, if he be not a regular employee, when he actually goes to work, and that the 24-hour period is thus a constant and fixed factor in the service from day to

day of that particular employee. This construction has convenience to recommend it, and seems to have been assumed in the argument of United States v. Atchison, Topeka & Santa Fé Railroad Co., 220 U. S. 37, 31 S. Ct. 362, 55 L. Ed. 361, though the court made no expression to this effect. It was adopted by the majority in United States v. Missouri Pacific Railway Co. (C. C. A.) 244 F. 38. The dissenting judge, however, thought the words should have their full, literal meaning, *any* 24 consecutive hours during which the employee was on duty more than the permitted time.

I think the dissenting judge was right. The statute, so interpreted, can be practically applied, and nothing short of that interpretation will attain its purpose. The purpose of the act, as stated in its brief title, is to promote safety on railroads. As expressed in Atchison, Topeka & Santa Fé R. Co. v. United States, 244 U. S. at page 342, 37 S. Ct. 637, 61 L. Ed. 1175, Ann. Cas. 1918C, 794: "The purpose of the act was to prevent the dangers which must necessarily arise to the employee and to the public from continuing men in a dangerous and hazardous business for periods so long as to render them unfit to give that service which is essential to the protection of themselves and those entrusted to their care. It is common knowledge that the enactment of this legislation was induced by reason of the many casualties in railroad transportation which resulted from requiring the discharge of arduous duties by tired and exhausted men whose power of service and energy had been so weakened by overwork as to render them inattentive to duty or incapable of discharging the responsible labors of their positions."

This purpose is to be effectuated by a strict limitation of the hours of service of the persons handling trains. Section 2 deals generally with all such employees, and then specially with those handling telegraphic or telephonic train orders. Employees generally must not remain on duty more than 16 *consecutive* hours, and may not go back on duty thereafter until they have been off duty 10 consecutive hours. Those who "in any 24-hour period" have been on duty "16 hours in the aggregate," though not consecutively, must have at least 8 consecutive hours off duty. Then specially it is provided that train order operatives shall not "be required or permitted to be or remain on duty for a longer period than *9 hours in any 24-hour period* in all towers, offices, places, and stations continuously operated night and day."

The case of Atchison, Topeka & Santa Fé Railroad Co. v. United States, 220 U. S. 37, 31 S. Ct. 362, 55 L. Ed. 361, settled that the provisions quoted as to train order operatives contemplated both consecutive and aggregated 9 hours of service and applied to either situation. The effect of all these provisions is to disqualify from further service all men who have already been on duty the number of hours to which they are respectively limited because of their supposed exhaustion. The act contemplates that this exhaustion shall be tested at all times and for each employee by considering his record of service for the 24 hours immediately preceding. The practical application of it, except in cases involving emergency, is to be thus made:

When an operative offers for service, the 24-hour period prior to the hour of his going on duty is to be considered, and if in that period he has already been on duty the limited number of hours he is wholly disqualified for service at that time. If found qualified to go on duty, the end of his contemplated period of service must next be considered and the 24-hour period next before and including his last hour of contemplated service must be considered, to see that he will not have become disqualified before the end of the proposed period of service. If he will be so disqualified, relief must be provided at such time as his availability for service will expire. Emergencies, as defined by the act, will extend the period of availability. In the case of a train order man, who is ordinarily available for only 9 hours in any 24, he may be put on duty for 4 additional hours, or, if on duty, may so continue for that additional time, if the emergency requires it. The important 24-hour period, therefore, is that immediately preceding and including any questioned service. The hour of the day at which the employee regularly and habitually goes to work is not of the slightest relevancy. His state of exhaustion when work is required of him is the point, and that is measured by the statute according to the hours of his service in the 24-hour period preceding and including it.

Harwell was a regular telegrapher in a day and night office, on duty from 2:30 p. m. to 10:30 p. m. each day. After having so served on March 21, 1927, he was put on duty on the 22d at 6 a. m. and worked until 2 p. m. In the 24-hour period preceding his going to work at 6 a. m., he had already worked 8 hours and was available for only 1 hour additional. When he went off duty at 2 p. m., the then preceding 24-hour period included 8 hours work on the 21st, and 8

more on the 22d, 16 hours in all. The statute was violated during 7 hours, if no emergency existed, and during 3 hours, if an emergency did exist. Bankston was also a regular operator, working ordinarily from 3:30 p. m. until 11 p. m. On March 19, 1927, he so worked, and was returned to duty the next morning at 6 a. m., and worked until 2 p. m. A similar thing happened on March 28th and 29th. The latter overtime only is sought to be penalized. When Bankston was called on duty at 6 a. m. on the 29th, he was qualified for duty for 1½ hours, and should have gone off, even in emergency circumstances, at 11:30 a. m. He continued on duty in the office, liable to be called on for the handling of orders, until 2 p. m., and did in fact take an order at 1:52 p. m. The statute was violated. Rushkin was a part-time operator, used for relief work. He usually worked from 6 a. m. to 10 a. m. On March 7, 1927, he was on relief duty from 3 p. m. to 11 p. m., 8 hours. The next morning he was put on his regular duty at 7:30 and worked until 11:30, 4 hours. He was instructed not to handle train orders, and it does not appear that he handled any. At 7:30 a. m. he was available for only 1 hour's duty. No emergency is claimed, but only that a new 24-hour period began for him at 6 a. m., his usual time for going to work. This construction of the act I have refused to follow. He was on duty in the office in the very words of the act. The instructions given him, and also given Bankston and Harwell, not to handle train orders, did not alter the result.

█ This case affords several instances of employees with similar instructions not observing them. The act does not make the actual handling of orders necessary for its violation. I find that the act was violated in Rushkin's Case on March 8th, and again in a similar way on April 4th. It would seem that where, as here, a night and day office is operated with three shifts of 8 hours each, that the sudden illness of an operator preventing his service, the emergency claimed in this case, could be met by continuing the preceding operator for 4 hours and calling the succeeding operator 4 hours in advance of his regular shift, thus bridging the 8-hour absence of any employee as an emergency, without violation of the act. No reason appears why this could not be done in the instances of Harwell and Bankston overtime.

Judgment may accordingly be entered for minimum penalties for the four violations sued for.