## UNITED STATES v. NORTHERN PAC. RY. CO. (two cases).

### Nos. 850, 1621.

District Court, D. Montana.
March 15, 1934.

James H. Baldwin, U. S. Atty., of Butte, Mont., and Arthur P. Acher, Asst. U. S. Atty., of Helena, Mont., and M. C. List, of Washington, D. C., for the United States.

Gunn, Rasch, Hall & Gunn, of Helena, Mont., for defendant.

BOURQUIN, District Judge.

These cases involve hours of service and operation of trains, respectively.

In the first is a motion for judgment on pleadings which disclose in the first count typical of seven, that the carrier permitted the dispatcher to remain on duty as follows: February 16, 1933, from 5 a. m. to 5:45 a. m. and from 8 a. m. to 4 p. m., and on the following day from 3:30 a. m. to 4:20 a. m., or 9 hours and 35 minutes in the 24-hour period from the beginning of duty as aforesaid. The dispatcher's regularly recurring shifts began at 8 a. m. each day.

45 USCA § 62 provides that no dispatcher "shall be required or permitted to be or re-

main on duty for a longer period than nine hours in any twenty-four-hour period," and a penalty is prescribed for any violation.

Plaintiff contends that "any twenty-four-hour period" contemplates that interval of time within which duty is performed, regardless of shift, citing U. S. v. Atlanta Co. (D. C.) 30 F.(2d) 109.

Defendant, that it imports the like interval beginning with the regular shift, citing U. S. v. Missouri Co. (C. C. A.) 244 F. 38.

The evil the statute designs to remedy is excessive labor by employees to the danger of themselves and the public, and so the statute must be liberally construed. See Atchison Co. v. U. S., 244 U. S. 342, 37 S. Ct. 635, 61 L. Ed. 1175, Ann. Cas. 1918C, 794; New York Cent. R. Co. v. U. S., 265 U. S. 44, 44 S. Ct. 436, 68 L. Ed. 892.

Evidently Congress believed a dispatcher on duty more than 9 hours in 24 spells danger, and it is equally evident that the danger is no less if the excessive duty occurs in 24 consecutive hours made up of parts of two shift-days, than if it occurs in the 24 hours of one shift-day.

The intent is to limit the dispatcher's duty to a maximum of 9 hours in any consecutive 24 hours, and the statutory language is apt to that end.

To construe the indefinite "any twenty-four-hour period" to import a definite "the twenty-four-hour period commencing with the beginning of the daily shift," a point not selected by Congress but by the carrier, would do violence to the language, tolerate the mischief, suppress the remedy, defeat the object, annul the statute.

Ease of computation like balance of danger is immaterial. See United States v. Northern P. Ry. Co., 254 U. S. 251, 41 S. Ct. 101, 65 L. Ed. 249.

██ Accordingly, the statutory "any twenty-four-hour period" admits of no reasonable interpretation other than its literal meaning, viz., the 24 consecutive hours following any point of time.

In U. S. v. Missouri Pac. R. Co. (C. C. A.) 244 F. 38, 43, it is said that the spokesman for the conference committee in the Senate declared the 24-hour period would commence when the employee "enters upon the duties of his twenty-four hours of labor." This does not make sense.

██ However, this extemporaneous and casual oral declaration is entitled to far less consideration than a carefully prepared written committee report; and even the latter cannot attach to a statute a meaning not within its language. See St. Louis, I. M. & S. R. Co. v. Craft, 237 U. S. 661, 35 S. Ct. 704, 59 L. Ed. 1160.

In view of the premises, plaintiff is entitled to recover, and $100 upon each count.

██ The second case is submitted on an agreed statement of facts, and consistent testimony, by which it appears that departing Spokane for Livingston, defendant's freight train was 73 cars and caboose equipped with air brakes in order and use.

Before reaching Paradise, on the eighth car from the tender the brake was cut out for cause, but the air line continued to function.

Said town was not then a repair point though it had been, and it was then a terminal with facilities to break and make local freight trains as necessary, road engines doing the work, and they, caboose, and crew there changed.

That the air brake was cut out was discovered by the new crew as the train "was moving out of Paradise," and without change the train necessarily proceeded to Missoula, the first repair point out of Spokane and the nearest available, where the car was set out.

Amongst other things the statute (45 US CA § 9) provides that "all power-braked cars in such train which are associated together * * * shall have their brakes so used and operated" by the engineer.

Any power braked car is "associated" with other like cars when, like the car involved, its air brake is cut out and its air line is continued in use in the engineer's operation of air brakes on cars beyond it. See New York Cent. R. Co. v. U. S., 265 U. S. 41, 44 S. Ct. 436, 68 L. Ed. 892.

The original statute (section 9, supra) imposes an absolute duty in behalf of public policy, and to that end excludes all inquiry in respect to knowledge, motive, intent, diligence, accident. See Chicago, B. & Q. Ry. v. U. S., 220 U. S. 578, 31 S. Ct. 612, 55 L. Ed. 582.

Whenever, however, wherever a secure air brake car associated with like cars, in use became insecure, any further substantial operation of it incurred the penalty.

Of course, it could be moved to clear tracks and to repair, but probably none the less the penalty, if thereby, was substantial operation.

To some relieve the hardship is the amendment (45 USCA § 13) which provides that a car equipped with secure air brake in use becoming insecure, and likewise in respect to other equipment prescribed, if necessary, can be hauled to the nearest available repair point, without penalty.

Contrary to plaintiff's contention, this section does not limit such haulage to the defective car as a separate unit, but contemplates haulage of the car "as is," associated in a train. See Erie R. Co. v. U. S. (C. C. A.) 240 F. 28.

And from this construction of the section is a single exception, viz., if the car is defective to the extent it must be coupled with chains, it must not be hauled "as is" or in trains unless loaded with live stock or perishable freight.

Expressio unius, etc.

Plaintiff further contends that be this granted, yet the defective car must be disassociated from other air brake cars and placed at the rear end of the train, citing New York Cent. R. Co. v. U. S., supra.

But that case so decides only when the car is hauled past an available repair point, which is not the instant case.

In support of plaintiff's contention is nothing in the statute. Section 9 prohibits and penalizes hauling a car with cut out air brake in association with other air brake cars.

Section 13 so far relieves from prohibition and penalty, that if the cut out occurs in transit, if necessary, the car "may be hauled * * * to the nearest available point" of repair.

In so far as haulage of air brake cars is concerned, both sections 9 and 13 contemplate them in association, and nothing in the latter liberally construed imports haulage in disassociation.

As section 9 neither prohibited nor penalized haulage of a cut out air brake car disassociated from others, section 13 is unnecessary to authorize or relieve from consequences of any such haulage.

As some useful purpose must have inspired section 13, the only reasonable inference is the purpose to relieve from what section 9 does forbid, viz., haulage of such defective car in association with other like air braked cars.

Defendant is within section 13, and plaintiff is not entitled to recover any penalty.

Judgments accordingly.