# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Commissioners of Public Works of the City of Laurens, South Carolina, also known as the Laurens Commission of Public Works, Respondent,

v.

City of Fountain Inn, South Carolina, Petitioner.

Appellate Case No. 2018-001309

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Laurens County
J. Cordell Maddox, Jr., Circuit Court Judge

---

Opinion No. 27917
Heard June 12, 2019 – Filed September 18, 2019

---

## REVERSED

---

Sarah P. Spruill and Boyd B. Nicholson Jr., both of Haynsworth Sinkler Boyd, PA, and David W. Holmes, of Holmes Law Firm, all of Greenville, for Petitioner.

Robert L. Widener, of Burr & Forman, LLP, of Columbia, and Bernie W. Ellis, of Burr & Forman, LLP, of Greenville, for Respondent.

---

**JUSTICE KITTREDGE:** This case concerns a municipality's statutory ability to provide utility services beyond its corporate limits. Section 5-7-60 of the South Carolina Code (2004) authorizes a municipality to provide specified services, such as utilities, outside of its corporate limits "by contract" except within a so-called "designated service area for all such services of another municipality or political subdivision." The dispositive issue here centers on the meaning of the following provision in section 5-7-60: "For the purposes of this section designated service area shall mean an area in which the particular service is being provided or is budgeted or funds have been applied for as certified by the governing body thereof." For reasons explained below, we hold the requirement for certification "by the governing body thereof" applies in all of the enumerated circumstances for the establishment of a designated service area.

Several years ago, an industrial park was built in an unincorporated area in Laurens County between the City of Laurens (Laurens) and the City of Fountain Inn (Fountain Inn). Both municipalities provided natural gas service beyond their respective borders, and each sought to serve the industrial customers in the new industrial park. However, Laurens—through its subsidiary, the Laurens Commission of Public Works (LCPW)—claimed Fountain Inn could not compete for the industrial customers' business because LCPW had established a designated service area and therefore was the sole authorized natural gas provider to the industrial park. Fountain Inn believed the industrial park was not part of a designated service area, and thus LCPW did not have an exclusive right to provide natural gas to customers in the industrial park.

In support of its claim, LCPW asserted it had satisfied the requirements of section 5-7-60 by providing natural gas in the general vicinity for twenty years pursuant to a 1992 boundary line that was informally agreed to by Laurens and Fountain Inn. Agreeing with LCPW that it had properly created a designated service area, the circuit court enjoined Fountain Inn from providing natural gas service to the industrial park, and the court of appeals affirmed. *Comm'rs of Pub. Works of the City of Laurens v. City of Fountain Inn*, 423 S.C. 461, 815 S.E.2d 21 (Ct. App. 2018). Because there is no reasonable interpretation of section 5-7-60 that would permit LCPW to claim a designated service area over the industrial park, we reverse.

## I.

The facts here are not in dispute. In 1992, officials from both municipalities met to discuss establishing a boundary line in the unincorporated area between the two

cities for the purpose of providing natural gas outside their respective corporate limits. Following the meeting, LCPW's general manager sent a letter to Fountain Inn's natural gas system manager and enclosed a map (the 1992 Map) memorializing the proposed boundary line. Fountain Inn's system manager replied to the letter, expressing his agreement as to the accuracy of the proposed boundary line and stating the 1992 Map was "in agreement with the Fountain Inn City Council." LCPW's general manager then sent a second letter stating he was "in the process of preparing a resolution for adoption by both of our governing bodies." The boundary line was never formally ratified by either municipality's city council or LCPW. Since 1992, the parties generally treated the 1992 Map as a gentlemen's agreement, although disputes did arise, which the parties usually settled without resort to litigation.

However, the parties did not come to an informal resolution when the current dispute involving Owings Industrial Park arose. LCPW argues that the industrial park was constructed entirely on its side of the 1992 Map's boundary line. ZF Transmissions (ZF) was the first company to build in the industrial park and, unaware of the informal boundary line, solicited competing bids for its natural gas service from LCPW and Fountain Inn.

Believing the 1992 Map prohibited Fountain Inn from competing for ZF's business (or the business of any other future customer in the industrial park), LCPW filed a complaint, (1) asserting claims for breach of contract and promissory estoppel based on the 1992 Map; (2) seeking a declaratory judgment that it had established a designated service area pursuant to section 5-7-60; and (3) requesting an injunction prohibiting Fountain Inn from providing natural gas service in the designated service area, i.e., in any area past the boundary line established by the 1992 Map.[1] LCPW later withdrew its breach of contract and promissory estoppel claims, relying only on the claim that it had satisfied the statutory requirements of a designated service area.

During the bench trial, several witnesses testified LCPW generally provided natural gas service to customers all throughout the territory established by the boundary line on the 1992 Map. However, the area in and around Owings Industrial Park was unserved until the industrial park was completed because there were no customers there.

---

[1] After LCPW initiated this lawsuit, ZF accepted LCPW's bid for the natural gas contract.

Ultimately, the circuit court (1) found, pursuant to section 5-7-60, that LCPW had established a designated service area defined by the boundary line marked on the 1992 Map; and, thus, (2) enjoined Fountain Inn from providing natural gas service in that area. In support of its holding, the circuit court explained:

> [Section 5-7-60] defines a "designated service area" for purposes of this statute as the area "in which the particular service is being provided or is budgeted or funds have been applied for as certified by the governing body thereof." Based upon the language of Section 5-7-60, the [c]ourt agrees that the area served by LCPW on the southern and eastern side of the boundary line created in 1992 is [] LCPW's "designated service area" for natural gas service. The testimony at trial was undisputed that [] LCPW has furnished natural gas service in this area outside its corporate limits for over two decades and has the infrastructure to provide that service on an ongoing basis. It is also noted that in addition to having exclusively served the area for over two decades, [] LCPW passed a resolution [the day it filed its complaint] certifying that [] LCPW provides natural gas service in the area that it identifies as its Natural Gas Designated Service Area, and that it has budgeted to do so in accordance with Section 5-7-60. Therefore, the territory served by LCPW is a territory "in which the particular service [natural gas] is being provided or is budgeted or funds have been applied for as certified by the governing body thereof." S.C. Code Ann. § 5-7-60.

(Last alteration in original.)

The court of appeals affirmed the circuit court's decision. In pertinent part, the court of appeals held section 5-7-60 was unambiguous and required the court to apply its plain language:

> We agree with the circuit court the phrase in section 5-7-60 "as certified by the governing body" only applies to the portion of the sentence stating "funds have been applied for" and not the prior part of the sentence stating "an area in which the particular service is being provided." The record contains evidence the two parties generally observed the boundary provided by the [1992] Map. Because LCPW has been providing natural gas in the area, it has established a

designated service area. Accordingly, the circuit court did not err in finding LCPW had a designated service area in which Fountain Inn could not offer its services without LCPW's permission.

We granted Fountain Inn's petition for a writ of certiorari to review the court of appeals' decision.

## II.

Section 5-7-60 of the South Carolina Code provides, in relevant part:

> Any municipality *may* . . . furnish any of its services . . . in areas outside the corporate limits of such municipality *by contract* with any individual, corporation, state or political subdivision or agency thereof . . . *except within a designated service area . . . of another municipality or political subdivision . . . .* **For the purposes of this section designated service area shall mean an area in which the particular service is being provided or is budgeted or funds have been applied for as certified by the governing body thereof.** Provided, however, the limitation as to service areas of other municipalities or political subdivisions shall not apply when permission for such municipal operations is approved by the governing body of the other municipality or political subdivision concerned.

(Emphasis added, emphasis in original omitted.)

We agree with the lower courts that section 5-7-60 is unambiguous, and we therefore must apply the statute as it is written. *See, e.g.*, *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning."). In particular, the statute provides municipalities "may" furnish their services to areas outside their corporate limits "by contract" except within the designated service area of another. Thus, absent a designated service area, municipalities have the opportunity—not the right—to furnish their services by contract to nonresidents.

Section 5-7-60 defines a designated service area as "an area in which the particular service is being provided or is budgeted or funds have been applied for *as certified by the governing body thereof*." (Emphasis added.) Unlike the lower courts, we

find a plain reading of the sentence indicates the italicized language refers to all three parts of the sentence—that is, the governing body of the designated service area must certify the area is one "in which the particular service is being provided or is budgeted or funds have been applied for" by the purported exclusive provider. While LCPW has legal authority to provide services—exclusively so—to residents of Laurens, we have been presented with no legal basis to extend that authority beyond the city's boundaries. Thus, here, to have created a designated service area in or around Owings Industrial Park, Laurens County—as the governing body of that unincorporated area—must have certified LCPW was the authorized, exclusive natural gas provider in the area via one of the three specified methods. However, Laurens County has never done so, nor, according to the record, has it ever seen or acknowledged the boundary line established by the 1992 Map.

LCPW argues "as certified by the governing body thereof" refers not to the governing body of the designated service area (Laurens County), but to the municipality (Laurens) or service provider itself (LCPW). We disagree, for to permit a municipality or municipal service provider to unilaterally anoint a designated service area outside the city's boundaries would lead to an absurd result. Under LCPW's interpretation, section 5-7-60 would grant a municipality unfettered discretion to unilaterally lay exclusive claim to an area—a designated service area—outside its corporate boundaries, thus allowing the municipality to become the sole provider of services in the area with unrestricted authority to charge whatever rates it pleased. *See Childs v. City of Columbia*, 87 S.C. 566, 570–71, 70 S.E.2d 296, 298 (1911) (explaining municipalities do not owe a duty to nonresidents to contract with them at all, much less for reasonable rates, but instead owe a duty to their residents to provide their services to nonresidents "at the highest price obtainable"). We reject a construction of section 5-7-60 that is contrary to the statutory language and, moreover, would essentially allow a single municipality to create a monopoly across the entire county based purely on it being the first to claim the territory, with no ability of the county or nonresidents to stop the municipality.

When a municipality provides services to its residents, there are inherent safeguards—through the electoral process and otherwise—that ensure accountability. Those safeguards can similarly be maintained through the contract method of section 5-7-60, as the parties have the ability to negotiate the terms of the arrangement. The natural safeguards disappear when a municipality becomes a provider of services in a "designated service area" beyond its borders. There is no contract; there is no negotiation; there is no accountability through the electoral process or otherwise. With the exclusivity that accompanies a designated service

area designation, there is simply no choice, and the municipality is wholly unaccountable to the nonresident customers.  It necessarily follows that the requirements of section 5-7-60 must be strictly followed.

LCPW relies on *City of Darlington v. Kilgo*, 302 S.C. 40, 393 S.E.2d 376 (1990).  *Kilgo* is easily distinguished.  *Kilgo* involved a dispute between a county and a city which was resolved with reference to only the contract provision of section 5-7-60, without any consideration of the existence and implications of the designated service area provision of the statute.  *Id.* at 43, 393 S.E.2d at 378 (concluding the "legislative intent [underlying sections 4-19-10 (1986) and 5-7-60 of the South Carolina Code] was to allow municipalities to continue to offer fire protection service in areas previously served under contract, and that such areas could not be included in any [subsequent] county district plan [to provide services] without prior agreement with the municipality").  Here, unlike *Kilgo* and the other cases cited by LCPW, we have two municipalities that seek to provide services outside their respective municipal boundaries in an unincorporated area of Laurens County, and the dispute is resolved entirely by reference to the designated service area portion of section 5-7-60.  Moreover, to the extent *Kilgo* was ever viewed as an authoritative interpretation of section 5-7-60 (rather than section 4-19-10 alone), its precedential force in that respect has been, quite frankly, minimized by subsequent case law that emphasizes the need for a contract to avoid being subsumed in a *county's* designated service area.  *See, e.g.*, *Carolina Power & Light Co. v. Darlington Cty.*, 315 S.C. 5, 9, 431 S.E.2d 580, 582 (1993) ("The statutes as interpreted in *Kilgo*, *supra*, clearly require a valid contract with the city to avoid inclusion in the county fire district.  As we stated in *Kilgo*, the legislative intent of the statutes is to allow counties to establish taxing districts for fire protection services without invading the province of another political subdivision or fire district.  By necessity, it is required that a contract be in existence to prevent an encroachment by a county fire district when boundaries are established."); *cf. Sloan v. City of Conway*, 347 S.C. 324, 328 & n.6, 555 S.E.2d 684, 686 & n.6 (2001) (emphasizing the importance of the provision of section 5-7-60 dealing with providing service "by contract"); *Calcaterra v. City of Columbia*, 315 S.C. 196, 197–98, 432 S.E.2d 498, 499–500 (Ct. App. 1993) (per curiam) (same).[2]

---

[2] LCPW's reliance on *Spartanburg Sanitary Sewer District v. City of Spartanburg* is misplaced for similar reasons.  283 S.C. 67, 71, 73, 321 S.E.2d 258, 260, 261 (1984) (involving a dispute not between two municipalities, but between a municipality and a special purpose district created by the legislature to "make available throughout the district sanitary sewer services"; finding there was no

Finally, we find granting LCPW a designated service area—the contours of which are established by reference to the 1992 Map—cannot be supported even under LCPW's construction of section 5-7-60 because it would give formal legal effect to the 1992 Map, when the governing bodies of Fountain Inn, Laurens, and LCPW failed to adopt the boundary line.[3] *Cf. Carolina Power & Light Co.*, 315 S.C. at 9–10, 431 S.E.2d at 582–83 (discussing the requirements to have a valid contract for services under section 5-7-60 and other statutes, and stating, "The use of some public authorization or ordinance by the appropriate municipal government is critical . . . . A municipal corporation is not bound by a contract made in its name by one of its officers or by a person in its employ, although within the scope of its corporate powers, if the officer or employee had no authority to enter into such a contract [o]n behalf of the corporation." (internal quotation and alteration marks omitted)). LCPW argues that "serving the area exclusively for more than 20 years and providing the service, *standing alone*, creates a designated service area under [section] 5-7-60 without any certification by anyone." However, as discussed above, merely providing service to an area for a period of time does not meet the section 5-7-60 criteria for creating a designated service area.

Fountain Inn does not quibble with LCPW's ability to enter into contracts in the area of the industrial park. Fountain Inn simply asserts there is no designated service area, leaving each municipality free to compete for each customer's business in the industrial park. Fountain Inn is plainly correct.

## III.

Accordingly, under the circumstances presented and pursuant to section 5-7-60, LCPW has failed to establish a designated service area entitling it to exclusively

---

"indication of legislative intent to allow the [municipality] to extend its collection lines to areas outside its corporate limits [even if] it could serve the areas more economically than the Sewer District"; and concluding the municipality could continue serving those customers outside its municipal limits with whom it had already entered into a contract before the creation of the special purpose district).

[3] For this reason, we find LCPW's position is inconsistent. LCPW abandoned any reliance on a contract theory, yet the entirety of its claim of a designated service area is tethered to the 1992 Map.

provide natural gas services to the area in which the industrial park is located.[4]  We therefore reverse.

**REVERSED.**

**BEATTY, C.J., HEARN and JAMES, JJ., concur.  FEW, J., concurring in a separate opinion.**

---

[4] The parties have made much of the standard of review.  The parties' dispute in this regard is of no moment, for the facts are not in dispute and, more importantly, this case is purely one of statutory interpretation, dependent only on how the undisputed facts apply to the statute.  As the court of appeals found, this case thus solely presents a question of law, which we review de novo.  *S.C. Dep't of Soc. Servs. v. Boulware*, 422 S.C. 1, 6, 809 S.E.2d 223, 226 (2018) ("Questions of statutory interpretation are questions of law, which are subject to *de novo* review and which we are free to decide without any deference to the court below." (internal quotation marks omitted)).

**JUSTICE FEW:** I agree with the majority that in the pivotal sentence of section 5-7-60 of the South Carolina Code (2004), the phrase "as certified by the governing body thereof" must apply to the first of what appear to be three items listed in series in the sentence. Thus, in this case, "a designated service area" must be "an area in which the particular service is being provided[,] . . . as certified by the governing body" of the service area. As the majority explains, that "governing body" must be the County. I disagree, however, that this sentence is unambiguous, or contains any plain language.

First, the sentence could use four commas: one to set off the introductory clause, two to separate the items in the series, and one to set off the "as certified by" clause. In most circumstances, the presence or absence of a comma is not determinative of whether the writing is ambiguous. *See State v. Pilot Life Ins. Co.*, 257 S.C. 383, 391, 186 S.E.2d 262, 266 (1972) ("'The presence or the absence of a comma, according to the whim of the printer or proofreader is so clearly fortuitous that it is wholly unsafe as an aid to statutory interpretation.'" (quoting *Erie R. Co. v. United States*, 240 F. 28, 32 (6th Cir. 1917))). In this instance, however, the absence of a comma to set off the "as certified by" clause is significant. Under the last antecedent doctrine, "The presence of a comma separating a modifying clause in a statute from the clause immediately preceding it is an indication that the modifying clause was intended to modify all the preceding clauses and not only the last antecedent one . . . ." 82 C.J.S. *Statutes* § 443 (2009). Where there is no comma, however, "clauses are to be applied to the immediately preceding words or phrase. Such . . . clauses are not to be construed as extending to or modifying others that are more remote . . . ." *Id.* Therefore, the absence of a comma setting off the "as certified by" clause is an indication the Legislature did not intend the clause to apply to the first item in the series. In other words, the absence of a comma in this instance creates an ambiguity.

Second, the items in the apparent series are not parallel, and thus it is not possible to know with clarity from the words themselves what the Legislature intended. To illustrate my point, using the first item in the series, the sentence provides, "designated service area shall mean an area in which the particular service is being provided." As to the second item in the series, the item makes sense only if it is read with that same structure: "designated service area shall mean an area in which the particular service . . . is budgeted." So far, this structure makes perfect sense. As to the third item, however, using the structure of the first two items, the item reads "designated service area shall mean an area in which the particular service . . . funds have been applied for." That makes no sense, and thus, the sentence is ambiguous.

Finally, the majority makes a convincing argument—with which unequivocally I agree—that the phrase "governing body" must refer to the County—not to Fountain Inn or LCPW—when considering the Legislature's intent with regard to the first item in the series. The majority's success on this point, however, demonstrates the sentence is ambiguous. Consider the second and third items in the series. If a "governing body" were to "budget" for the infrastructure for utility service to an area, or if it were to "appl[y] for" funds to do so, *that* "governing body" would necessarily be the provider of the service, which is Fountain Inn or LCPW, *not* the County. In other words, for the second and third items in the series, the sentence makes no sense if the "governing body" is the County—as the majority has demonstrated must be true for the first item—because the County would never provide funds for the utility to do its business.

The majority's interpretation of the pivotal sentence in section 5-7-60 is correct, but is an interpretation based on the principles of statutory construction.[5] It is not a reading of the plain language of an unambiguous statute.

---

[5] The majority specifically invokes the principle of statutory construction that we will not read a statute to lead to an absurd result. *See supra* slip op. at 6; *see also Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994) ("However plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the Legislature . . . .").